Todd C. Tucci (Idaho Bar # 6526) (*pro hac vice pending*)
Sarah K. Stellberg (Idaho Bar # 10538) (*pro hac vice pending*)
ADVOCATES FOR THE WEST
P.O. Box 1612
Boise, ID 83701
(208) 342-7024
(208) 342-8286 (fax)
ttucci@advocateswest.org
sstellberg@advocateswest.org

Aaron Garrett (Utah Bar # 12519)
Nonprofit Legal Services of Utah
177 East 900 South, Suite 202
Salt Lake City, UT 84111
(385) 419-4111
aaron@nonprofitlegalservices.com

*Attorneys for Plaintiff*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION, SOUTHERN REGION

| | |
|---|---|
| FRIENDS OF CEDAR MESA,<br><br>     Plaintiff,<br><br>     v.<br><br>U.S. DEPARTMENT OF THE INTERIOR;<br>BUREAU OF LAND MANAGEMENT; and<br>KENT HOFFMAN, in his official capacity as<br>the Deputy State Director, Division of Lands<br>and Minerals, BLM Utah State Office;<br><br>     Defendants. | Case No. _____<br><br><br>**COMPLAINT FOR DECLARATORY<br>AND INJUNCTIVE RELIEF** |

## INTRODUCTION

1.      This case challenges Federal Defendants' March 2018 Lease Sale of 43 oil and gas leases covering approximately 51,400 acres of federal public lands in San Juan County, Utah without proper study and acknowledgement of the likely harms to historic, cultural, and natural resources.

2.      The lease parcels include some of our Nation's most significant archaeological resources. Diverse peoples and cultures have inhabited and traversed these lands for at least 9,000 years and left well-preserved evidence of their activities in the form of cliff dwellings, pueblos, kivas, petroglyph and pictograph panels, ancient roads, and Chaco-era (circa 900-1150 A.D.) "great houses." A total of 1,346 ancient sites have been recorded in the lease area, 984 of which have been deemed eligible for listing on the National Register of Historic Places—this despite the fact that very limited scientific study has been undertaken in the area. Numerous indigenous tribes consider these sites sacred.

3.      The Bureau of Land Management (BLM) itself has acknowledged that this landscape contains some of the highest archaeological site densities in North America. Jim Allison, a well-respected archaeologist and professor at Brigham Young University who has worked extensively in the region, also said of the Lease Sale area:

> I don't know any other place in the world where you could go out and walk carefully along a square mile of ground and find 100 sites. . . . There are so many sites, it would take an army of archaeologists decades to map them. . . . We know enough to say site densities are so high [that] they shouldn't do oil and gas extraction there.

4.      In addition to preserving a vital record of human history, this region is also a burgeoning recreation destination, known for its scenic vistas, colorful sandstone cliffs, twisting canyons, and diversity of plant and animal life. Numerous national monuments and landmarks—

including Bears Ears, Hovenweep, and Canyons of the Ancients National Monuments; and Alkali Ridge National Historic Landmark—sit on the doorstep of the lease area and evidence its national importance.

5.      Oil and gas leasing will have significant, irreparable impacts on this landscape. Standard lease terms grant companies the right to explore for oil or gas for a minimum of ten years and extract indefinitely if the lease is producing. Without proper mitigation measures in place, energy leasing and development can directly and indirectly impact sensitive cultural and natural resources. Ground clearing and grading can disturb buried archaeological materials and wildlife habitat. Industrial traffic and ground clearing can increase dust particulates that degrade fragile rock art panels. Construction of new access roads can increase site visibility and accessibility, leading to increased vandalism, looting, and accidental disturbance of historic resources. The sights and sounds of drill rigs, pumpjacks, compressor facilities, and pipelines also detract from the natural setting and feeling of historic sites.

6.      Making matters worse, only a small portion of the lease area has ever been surveyed for cultural resources, meaning that thousands of significant sites remain undocumented. BLM itself has previously acknowledged these risks and deferred leasing in this region to avoid cultural resources impacts.

7.      Despite the obvious potential for adverse impacts, extraordinary concentration of sensitive resources, and lack of rigorous professional survey of this landscape, BLM concluded that the March 2018 Lease Sale and ensuing development have no potential to adversely affect cultural resources or to significantly impact the surrounding environment.

8.      In reaching this conclusion, BLM relied on arbitrary, capricious, and legally inadequate efforts to identify, study, and document the potential impacts to cultural and

COMPLAINT - 3

environmental resources, in violation of the National Historic Preservation Act (NHPA),

National Environmental Policy Act (NEPA), Administrative Procedure Act (APA), Endangered

Species Act (ESA), and their implementing regulations. BLM also failed to consider reasonable

alternatives that would defer or apply protective stipulations to the most sensitive lease parcels,

in violation of NEPA and the APA.

9.      Accordingly, Plaintiff Friends of Cedar Mesa asks this Court to hold unlawful and

set aside Defendants' approval of the March 2018 Lease Sale, and reverse and set aside the

unlawful oil and gas leases.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §

1331 (federal question). This Court also can provide relief under 28 U.S.C. § 2201 (declaratory

judgment), 28 U.S.C. § 2202 (injunctive relief), 16 U.S.C. § 1540 (Endangered Species Act), and

5 U.S.C. §§ 553, 702 and 706.

11.     The challenged agency actions are final and subject to judicial review pursuant to

5 U.S.C. §§ 702, 704, and 706.

12.     Plaintiff has exhausted all required administrative remedies and provided BLM

notice of its intent to bring this action more than 60 days prior to filing this lawsuit.

13.     Venue in the District of Utah is appropriate under 28 U.S.C. § 1391(e) because it

is where a substantial part of the events or omissions giving rise to the claim occurred, the

federal public lands at issue are situated in this district, and Plaintiff resides in this district.

## PARTIES

14.     Plaintiff FRIENDS OF CEDAR MESA is a non-profit organization based in

Bluff, Utah dedicated to the protection of natural and historic resources on the public lands in

southeast Utah. Formed in 2010 by a former BLM ranger, Friends of Cedar Mesa works to ensure that the public lands of San Juan County, Utah are respected and protected. Friends of Cedar Mesa is the only conservation non-profit exclusively focused on the cultural and natural resources on the public lands of San Juan County. The organization participated actively in the administrative process for the March 2018 Lease Sale by filing scoping comments, commenting on the Draft Environmental Assessment, protesting the challenged leasing decision, and serving as a consulting party to BLM during the review process mandated by Section 106 of the National Historic Preservation Act, 54 U.S.C. § 306108.

15.     Friends of Cedar Mesa will suffer direct injuries from Defendants' unlawful decision to approve the March 2018 Lease Sale without adequately studying the likely harms to historic, cultural, and natural resources.

16.     For example, a core component of Friends of Cedar's mission is improving the visitor experience and public awareness of the cultural and natural resources in San Juan County. BLM's March 2018 Lease Sale will impair these activities by detracting from the aesthetic quality of the landscape and by making it more difficult for the public to experience the cultural landscape as prior cultures would have centuries ago. Friends of Cedar Mesa also monitors cultural sites in the lease area for looting, vandalism, and damage. New industrial development will increase these threats and require Friends of Cedar Mesa to spend additional resources monitoring access roads, construction sites, and seismic lines. Oil and gas leasing will detract from Friends of Cedar Mesa's ability to conduct or facilitate archaeological research in the lease area by destroying surface resources, subsurface deposits, and subtle landscape features, such as ancient roads, hearths, and shrines. It will also impair the organization's ability to continue

advocating for new protective designations for the Lease Sale area, by decreasing its perceived caliber.

17.     In sum, Defendants' unlawful actions have and will continue to perceptibly impair Friends of Cedar Mesa's existing activities—with a consequent drain on their limited organizational resources—resulting in direct and immediate harm to the organization. A favorable decision by this Court will redress those injuries.

18.     Friends of Cedar Mesa's staff, board members, and supporters will also be adversely affected by the March 2018 Lease Sale. They use and enjoy, and intend to continue using and enjoying, the areas impacted by the March 2018 Lease Sale for activities including hiking, river running, backpacking, photography, and observing the area's unique archaeology, geology, paleontology, and wildlife habitat. They derive recreational, spiritual, professional, aesthetic, educational, health, and other benefits and enjoyment from these activities, and they have a great interest in the protection and enhancement of cultural and natural resources in the leased areas. The construction and operation of wells contemplated by BLM's March 2018 Lease Sale will degrade the surface resources, viewsheds, and natural soundscapes of this landscape, thus injuring the continued use and enjoyment of the area by Friends of Cedar Mesa's staff, board members, and supporters. Such injuries will be redressed by the relief sought herein.

19.     Apart from this action, Friends of Cedar Mesa and its staff, board members, and supporters have no adequate remedy at law to address the foregoing injuries to their interests.

20.     Defendant U.S. DEPARTMENT OF THE INTERIOR (DOI) is the federal agency responsible for protecting and managing much of this country's wildlife, natural resources, public lands, and cultural heritage. DOI has nine bureaus, including the U.S. Bureau of Land

Management, and is responsible for ensuring that BLM's management of the nation's public

lands is in accordance with all applicable laws, including the NHPA, NEPA, and ESA.

21.     Defendant U.S. BUREAU OF LAND MANAGEMENT (BLM) is the agency

within the DOI directly responsible for carrying out the Department's obligations under statutes

and regulations governing oil and gas exploration, leasing, and development, and for applying

and implementing the federal laws and regulations at issue in this Complaint. BLM is the agency

that approved the March 2018 Lease Sale and issued the underlying NEPA, NHPA and ESA

documentation at issue in this case.

22.     Defendant KENT HOFFMAN is sued in his official capacity as Deputy State

Director, Lands and Minerals, of BLM's Utah State Office. Deputy Director Hoffman is

responsible for overseeing Utah BLM's minerals program, including the Canyon Country

District Office where the March 2018 Lease Sale parcels are located. He signed the Decision

Record, Finding of No Significant Impact, and Protest Decisions for the March 2018 Lease Sale.

## LEGAL FRAMEWORK

### A.     National Historic Preservation Act

23.     The National Historic Preservation Act (NHPA), 54 U.S.C. §§ 300101–320303,

formally recognizes historic preservation as an important policy of the United States.

24.     Its opening passages declare that "(1) the spirit and direction of the Nation are

founded upon and reflected in its historic heritage; (2) the historical and cultural foundations of

the Nation should be preserved as a living part of our community life and development in order

to give a sense of orientation to the American people; (3) the historic properties significant to the

Nation's heritage are being lost or substantially altered, often inadvertently, with increasing

frequency; (4) the preservation of this irreplaceable heritage is in the public interest so that its

vital legacy of cultural, educational, aesthetic, inspirational, economic, and energy benefits will be maintained and enriched for future generations of Americans." National Historic Preservation Act § 1, Pub. L. No. 89-665 (Oct. 15, 1966), as amended by Pub. L. No. 96-515 (Dec. 12, 1980).

25.     The NHPA seeks to protect America's heritage in part by requiring federal agencies to take into account the effect of their "undertakings" on historic properties. *See* 54 U.S.C. § 306108; 36 C.F.R. pt. 800. An important part of this so-called "Section 106" review process is consultation with the appropriate State Historic Preservation Officer (SHPO), Native American tribes, and other interested parties.

26.     The Section 106 process entails four basic steps. First, the responsible agency must "determine whether the proposed Federal action is an undertaking . . . and, if so, whether it is the type of activity that has the potential to cause effects on historic properties." *Id.* § 800.3(a). An "undertaking" is any "project, activity, or program . . . requiring a Federal permit, license or approval." *Id.* § 800.16(y). A "historic property" is "any prehistoric or historic district, site, building, structure, or object included on, or determined eligible for inclusion on, the National Register [of Historic Places]" ("National Register"). *Id.* § 800.16(l)(1); 54 U.S.C. § 300308.

27.     Second, if the agency undertaking has the potential to affect historic properties, the agency must define the Area of Potential Effects ("APE") for the action. 36 C.F.R. § 800.4. The NHPA regulations define the APE as:

> the geographic area or areas within which an undertaking may directly or indirectly cause alterations in the character or use of historic properties . . . The area of potential effects is influenced by the scale and nature of an undertaking and may be different for different kinds of effects caused by the undertaking.

*Id.* § 800.16(d).

28.     Third, the agency must make a "reasonable and good faith effort" to identify historic and cultural properties within the APE. *Id.* § 800.4(b)(1). This "may include background

COMPLAINT - 8

research, consultation, oral history interviews, sample field investigation, and field survey." *Id.* § 800.4(b)(1). The agency must evaluate the National Register eligibility of all sites identified in the APE. *Id.* § 800.4(c). For sites not previously evaluated for National Register eligibility, the agency must "apply the National Register criteria" to determine whether they are potentially eligible for listing. *Id.* "The passage of time, changing perceptions of significance, or incomplete prior evaluations may require the agency official to reevaluate properties previously determined eligible or ineligible." *Id.*

29. To be considered eligible for listing on the National Register, a property must possess "integrity of location, design, setting, materials, workmanship, feeling, and association" and meet at least one of four criteria:

> Criterion (a) "are associated with events that have made a significant contribution to the broad patterns of our history"; or
>
> Criterion (b) "are associated with the lives of persons significant in our past"; or
>
> Criterion (c) "embody the distinctive characteristics of a type, period, or method of construction; or that represent the work of a master; or that possess high artistic values; or that represent a significant and distinguishable entity whose components may lack individual significance"; or
>
> Criterion (d) "have yielded, or may be likely to yield, information important in prehistory or history."

536 C.F.R. § 60.4.

30. Fourth, if the agency finds that eligible properties are present in the APE, it must assess whether the proposed undertaking may cause adverse effects on the identified historic properties, in coordination with consulting parties. 36 C.F.R. §§ 800.4(d), 800.5.

31. The definition of "adverse effect" is broad. "An adverse effect is found when an undertaking *may* alter, directly or indirectly, any of the characteristics of a historic property that qualify the property for inclusion in the National Register in a manner that would diminish the

integrity of the property's location, design, setting, materials, workmanship, feeling, or association." *Id.* § 800.5(a)(1) (emphasis added). Examples of adverse effects include the "[i]ntroduction of visual, atmospheric or audible elements that diminish the integrity of the property's significant historic features," and a "[c]hange of the character of the property's use or of physical features within the property's setting that contribute to its historic significance." *Id.* 800.5(a)(2).

32.     The Section 106 process concludes with an agency determination of "adverse effect" or "no adverse effect." *See* § 800.5(d)(1).

33.     If the agency reaches a "no adverse effect" finding, it must provide notice and documentation of such finding to all consulting parties. *Id.* § 800.4(d). Consulting parties may object to such a finding, which elevates the consultation process further. *Id.*

34.     If the agency reaches an "adverse effect" finding, it must notify all consulting parties and invite their views to assess adverse effects. *Id.* If adverse effects cannot be resolved, the process is elevated again to the Advisory Council on Historic Preservation (ACHP or "Advisory Council") and the head of the agency undertaking the action. *Id.* § 800.7. Until this process is complete, the undertaking in question cannot go forward.

35.     Agency officials must "ensure that the section 106 process is initiated early in the undertaking's planning, so that a broad range of alternatives may be considered." *Id.* § 800.1.

36.     They must also "ensure that a determination, finding, or agreement under the procedures in this subpart is supported by sufficient documentation to enable any reviewing parties to understand its basis." *Id.* § 800.11(a).

**B.     National Environmental Policy Act (NEPA)**

37.     NEPA is "our basic national charter for protection of the environment." 40 C.F.R.

§ 1500.1(a). Its twin aims are: (1) to foster informed decisionmaking by requiring agencies to

consider the environmental impacts of their proposed actions; and (2) to ensure that agencies

inform the public that they have considered environmental concerns in their decisionmaking.

38.     To accomplish these objectives, NEPA requires federal agencies to prepare an

Environmental Impact Statement (EIS) to consider the effects of each "major Federal action[ ]

significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C)(i).

39.     NEPA's implementing regulations define "effects" to include "historic" and

"cultural" impacts, "whether direct, indirect, or cumulative." 40 C.F.R. § 1508.8.

40.     To determine whether the impacts of a proposed action are significant enough to

warrant preparation of an EIS, the agency may prepare an Environmental Assessment (EA). The

EA must take a "hard look" at the impacts and include "brief discussions of the need for the

proposal, of alternatives . . . , [and] of the environmental impacts of the proposed action and

alternatives." *Id.* § 1508.9.

41.     If, after preparing an EA, the agency determines an EIS is not required, it must

issue a Finding of No Significant Impact or "FONSI" explaining why the project's impacts are

insignificant. *Id.* §§ 1501.4, 1508.9, 1508.13.

42.     An assessment of whether an impact is "significant" must consider the "context

and intensity" of the impact. *Id.* § 1508.27. "Context" refers to the setting of the proposed action

and "intensity" refers to the severity of the impact. *Id.* § 1508.27(a).

43.     "Intensity" must be evaluated with a host of factors in mind, including but not

limited to "[u]nique characteristics of the geographic area such as proximity to historic or

cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas[,]" "[t]he degree to which the effects on the quality of the human environment are likely to be highly controversial[,]" "[t]he degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks[,]" "[w]hether the action is related to other actions with individually insignificant but cumulatively significant impacts," "[t]he degree to which the action may adversely affect districts, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historical resources[,]" and "[t]he degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973." *Id.* § 1508.27(b).

44.     An agency must also "rigorously explore and objectively evaluate all reasonable alternatives," including a "no action" alternative. *Id.* § 1502.14; *see also id.* § 1508.9(b). This analysis of alternatives is the "heart" of NEPA review. *Id.*

45.     NEPA review must occur at the earliest possible time, 40 C.F.R. § 1501.2, and prior to any irreversible, irretrievable commitment of resources. 40 C.F.R. § 1502.16.

46.     Oil and gas leasing without a No-Surface Occupancy (NSO) stipulation—a stipulation that prohibits occupancy or disturbance on the land surface—is an irretrievable commitment of resources.

**C.     Endangered Species Act (ESA)**

47.     The ESA was enacted to "provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved [and] to provide a program for the conservation of such [] species." 16 U.S.C. § 2(b).

48.     Once species are listed as threatened or endangered by the U.S. Fish and Wildlife

Service or National Marine Fisheries Service ("Services"), the Services must designate critical

habitat, which is occupied or unoccupied habitat containing physical or biological features

essential to the conservation of the species and which may require special management

considerations or protection. *Id.* §§ 1532(5), 1533(a)(3).

49.     A federal agency that authorizes, funds, or carries out an activity that "may

affect" a listed species must first undertake an inter-agency consultation process to ensure that it

does not jeopardize the continued existence of the species or result in the destruction or adverse

modification of critical habitat. *Id.* § 1536(a)(2). The threshold for a "may affect" determination

is low. This determination is triggered when a listed species is present in the project area.

50.     During the ESA consultation process, if the action agency concludes in a

"biological assessment" that the activity is "not likely to adversely affect" the listed species or

adversely modify its critical habitat, and the Service concurs with that conclusion, then the

consultation is complete. 50 C.F.R. §§ 402.12, 402.14(b). If, however, the action agency or the

Service determines that the activity is "likely to adversely affect" the listed species or its critical

habitat, then the Service completes a "biological opinion" to determine whether the activity will

jeopardize the species or result in destruction or adverse modification of critical habitat. *Id.* §

402.14. If the Service determines that the action will jeopardize the species or adversely modify

critical habitat, it may propose one or more reasonable and prudent alternative actions that would

avoid such results. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(g)(5).

51.     An agency must request reinitiation of consultation if: (a) the amount or extent of

taking specified in the incidental take statement is exceeded; (b) new information reveals effects

of the action that may affect listed species or critical habitat in a manner or to an extent not

previously considered; (c) the identified action is subsequently modified in a manner that causes

an effect to the listed species or critical habitat that was not considered in the biological opinion; or (d) a new species is listed or critical habitat designated that may be affected by the identified action. 50 C.F.R. § 402.16.

      **D.**    **Administrative Procedure Act (APA)**

     52.     Judicial review of agency actions under the NHPA and NEPA are governed by the APA, which provides a right to judicial review for any "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action." 5 U.S.C. § 702. Review under the APA is further limited to "final agency action for which there is no other adequate remedy in a court." *Id.* § 704.

     53.     The APA directs courts to "hold unlawful and set aside agency action . . . found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A). Agency actions may also be set aside where the action is "without observance of procedure required by law." *Id.* § 706(2)(B)–(F).

      **E.**    **Oil and Gas Leasing on Public Lands**

     54.     The Mineral Leasing Act (MLA), 30 U.S.C. §§ 181–287, authorizes the Secretary of the Interior to offer certain federal minerals for lease, including oil and gas. The Secretary has delegated this authority to BLM for onshore minerals. *See* 43 C.F.R. § 3100.0-3.

     55.     Under the MLA, BLM manages oil and gas drilling on public lands using a three-stage process: (1) land-use planning, (2) parcel nominations and leasing, and (3) permitting of parcel exploration and drilling.

     56.     In the first phase, BLM prepares a Resource Management Plan (RMP) in accordance with FLPMA, 43 U.S.C. § 1712, and FLPMA's planning regulations, 43 C.F.R. §§ Part 1600. RMPs generally define the allowable uses of the public lands in the planning area,

COMPLAINT - 14

including which lands may be leased for oil and gas development and under what conditions. An RMP does not mandate leasing any specific lands. BLM must prepare an EIS evaluating the expected environmental impact of potential land management decisions made in RMPs, including oil and gas development. 43 C.F.R. § 1601.0-6.

57.     In the second phase, companies typically nominate through submission of "expressions of interest" public lands for inclusion in an upcoming competitive lease sale. BLM reviews the nominated parcels to determine which parcels to include in the sale. This review process can result in parcel rejections, deferrals, and/or stipulations being placed on the leases to protect the environment or other resource values. *See id.* § 3101.1-3.

58.     The MLA vests BLM with considerable discretion to determine which lands will be leased and does not obligate BLM to offer public lands that operators have nominated.

59.     BLM then offers its chosen parcels in quarterly, competitive lease auctions, in accordance with 43 C.F.R. Part 3120. If a parcel is nominated and brought to the lease sale but receives no bids, it can be leased non-competitively after the sale. Once issued, a lease is valid for 10 years but can be held indefinitely if it is producing oil or gas "in paying quantities." *Id.* §§ 3120.2-1; 3107.2-1.

60.     The issuance of a lease generally gives the lessee a right to use some of the land for oil and gas development. 43 C.F.R. § 3101.1-2. Issuing leases therefore limits BLM's ability to prohibit oil and gas development altogether on the leased land.

61.     In the third and final phase, the lessee submits an application for a permit to drill (APD) to BLM prior to drilling. 43 C.F.R. § 3162.3-1(c). BLM may impose conditions of approval (COAs) on drilling permits to address site-specific concerns.

# FACTUAL BACKGROUND

**A.    The Historic, Cultural, and Natural Resources of the Lease Parcels and Surrounding Area**

62.    BLM's March 2018 Utah Lease Sale encompassed lands managed by two of BLM's Utah Field Offices: the Moab Field Office and the Monticello Field Office. Together, these two offices comprise BLM's Canyon Country District.



BLM, BLM Utah Administrative Boundaries Map, https://www.blm.gov/sites/blm.gov/files/BLM-Utah_administrative-boundaries-map.pdf.

63.    The lease area features some of the highest concentrations of archaeological sites in the nation. Humans of multiple cultures have inhabited, traversed, and used these lands for more than 9,000 years and have left evidence of their activities on the landscape in the form of

archaeological sites, buildings, and objects. Chaco-era great houses, community centers, and pueblos; petroglyphs and pictographs; artifacts; Navajo sweat houses and hogans; kivas; granaries; shrines; artifacts; and potential segments of the Old Spanish Trail all scatter the region. Among the most well-known sites are Alkali Ridge, Recapture Canyon, Jenny's Canyon, Mustang Mesa, and Montezuma Canyon—all harboring a rich and well-preserved record of Ancestral Puebloan habitation dating back thousands of years.

64.     In total, over 1,346 historic sites have been recorded in the lease area alone, 984 of which have been determined eligible for listing on the National Register. BLM itself claims that this landscape contains some "of the highest archaeological site densities in North America."

65.     This region also has cultural significance to a variety of Native American peoples. For example, the Hopi Tribe claims cultural affiliation to earlier identifiable cultural groups in Utah and their prehistoric archaeological sites. The Pueblo of Zuni has identified all ancestral archaeological sites in this region as places of traditional importance because of their association with Zuni ancestors and their oral migration histories. This landscape is also of cultural importance to the Pueblo of Acoma, whose people left archaeological sites as they migrated from their place of emergence in the North to their present home. The Utes also ascribe religious and traditional importance to much of southeastern Utah. They maintain that the spirits of their ancestors remain at archaeological sites as long as the sites are not disturbed.

66.     Despite its cultural significance, modern study of this landscape is still in the early stages. Less than 10% of all BLM lands within the Monticello Field Office have been subjected to intensive cultural resource surveys. Thousands of sites remain undocumented. Additionally, most prior cultural resource inventories were driven by Section 106 compliance for specific projects. Current understanding of the numbers, types, and distributions of cultural resources, as

well as of prehistoric and historical land use patterns, is therefore based on piecemeal information gleaned from a patchwork of small, disjointed surveys.

67.     Utah's Canyon Country District is also notable for its natural resources. The lease parcels possess scenically unique vistas; colorful sandstone cliffs and twisting canyons; and diverse vegetation ranging from aspen, pinyon, and juniper, to cottonwood and cacti. These lands support an array of threatened and endangered wildlife species, including the Mexican spotted owl, Southwestern willow flycatcher, and Yellow-bill cuckoo. Several parcels lie atop or drain into the San Juan River, which provides critical habitat for the endangered humpback chub, Colorado pikeminnow, bonytail, and razorback sucker (collectively, "Colorado River fishes").

68.     Given its wilderness characteristics, unique topography, and cultural history, this region is also a burgeoning recreation destination, helping to drive the State of Utah's $12 billion outdoor recreation economy. The parcels are also nestled between world-class protected areas, including Hovenweep, Canyons of the Ancients, and Bears Ears National Monuments; and Alkali Ridge National Historic Landmark.

69.     In February 2015, BLM considered leasing parcels in this area for oil and gas development, many directly adjacent to or overlapping the March 2018 parcels. Numerous conservation groups and Native American tribes formally protested the Lease Sale, citing potential conflicts with cultural resources. The National Park Service also expressed concerns about adverse effects on Hovenweep National Monument's world-famous night skies, natural soundscapes, and scenic views. BLM ultimately deferred 36 of the 53 parcels proposed for the sale, specifically citing likely adverse effects on cultural resources and BLM's lack of adequate information on cultural resources.

70.     The Trump Administration abruptly shifted course and resumed leasing in this contested area without completing the additional planning BLM previously deemed necessary.

**B.      BLM's Approval of the March 2018 Lease Sale**

71.     On June 23, 2017, BLM initiated a scoping process for its March 2018 Utah Lease Sale, proposing to lease 45 parcels containing 57,074 acres across southeastern Utah.

72.     In response to BLM's scoping notice, Friends of Cedar Mesa and others timely submitted scoping comments to BLM on July 26, 2017. Those comments identified impacts and alternatives that Plaintiff suggested for study in the NEPA process for the Lease Sale.

73.     In separate correspondence, Friends of Cedar Mesa requested and was granted Section 106 consulting party status for BLM's Cultural Resources Review.

74.     BLM segmented its NEPA analysis for the sale into two separate documents: (i) a Determination of NEPA Adequacy (DOI-BLM-UT-Y010-2017-0285-DNA) covering 14 parcels in BLM's Moab Field Office that were previously evaluated in the Moab Master Leasing Plan; and (ii) an Environmental Assessment (EA) (DOI-BLM-UT-Y010-2017-0240-EA) covering 29 parcels not encompassed in the Master Leasing Plan: 21 parcels in the Monticello Field Office and 8 parcels in the Moab Field Office.

75.     BLM published its Draft EA on September 20, 2017 ("September 2017 Draft EA"). Importantly, this document concluded there would be no impact on historic properties from the Lease Sale, *before the agency had even commenced Section 106 consultation*.

76.     The September 2017 Draft EA evaluated only the proposal to lease all 29 parcels under standard lease terms and applicable special stipulations (the "Leasing Alternative") and a "No Action Alternative." BLM concluded that no other alternatives would meet the purpose and need of the proposed action.

77.     The Leasing Alternative included two stipulations attached to all lease parcels containing cultural resources, but these stipulations were discretionary and waivable "if the BLM authorized officer determines that avoidance of direct and indirect impacts to historic properties is not feasible[.]"

78.     BLM predicted that only 11 wells would be drilled per parcel with a surface disturbance of 10-15 acres per well, based on a so-called Reasonably Foreseeable Development (RFD) scenario developed in 2008. BLM anticipated that some new or upgraded access roads would be required to access well pads and maintain production facilities.

79.     BLM acknowledged that:

[r]easonably foreseeable development resulting from leasing within the proposed area has the potential to impact cultural resources, both directly and indirectly. Potential direct effects are physical disturbance of a site from the construction of a well pad, associated access roads, or associated infrastructure (e.g., pipelines). Given the types of cultural resources known and expected in the area, potential indirect effects include changes to the landscape which result in impacts to a site's setting, feeling, or association; increased rock art exposure to dust resulting from increased traffic on roads; visual impacts to sensitive rock art sites or to elements of the Old Spanish Trail; and the potential to increase public access, potentially leading to increased vandalism and looting.

September 2017 Draft EA at 37.

80.     However, BLM determined that such impacts "do no [sic] reach the significant, or adverse effects, threshold." This finding was premised on the conclusion that (1) there was sufficient topographic complexity, vegetation, and spacing between most historic sites to accommodate 10–15 acres of disturbance somewhere on each parcel without adverse effects to historic properties; and (2) where site density is higher, stipulations attached to each parcel will ensure that "well pad placement will not have adverse effects to historic properties."

81.     In its September 2017 Draft EA, BLM ignored its obligations to consult with the U.S. Fish and Wildlife Service over the potential impacts of its leasing activities on threatened

COMPLAINT - 20

and endangered species. BLM acknowledged that several threatened and endangered species are likely to occur in the proposed lease areas—including Southwestern willow flycatcher (T), Mexican spotted owl (T), and Yellow-billed cuckoo (T)—yet BLM failed to prepare a Biological Assessment. BLM noted only that it "mailed a memo" to the Service identifying these species as potentially occurring within the project area. *See* September 2017 Draft EA at 64. The September 2017 Draft EA failed to discuss the possible presence of the Colorado River fishes.

82.     Friends of Cedar Mesa timely filed comments on the September 2017 Draft EA. Those comments raised concerns with BLM's delineation of the Area of Potential Effects (APE), BLM's site identification efforts, the lack of viewshed analyses or consideration of impacts to the setting and feeling of cultural resources, the lack of meaningful analysis of dust impacts or increased vandalism and looting, lack of consideration of potential archaeological districts, and BLM's ultimate "No Adverse Effect" finding. Friends of Cedar Mesa also urged BLM to consider other alternatives, including deferral of the most culturally sensitive parcels and a boundary adjustment to parcel 36 to avoid cultural resource and water quality impacts.

83.     Meanwhile, on September 25, 2017, BLM issued its draft Cultural Resources Review, and permitted a 30-day comment period.

84.     On October 13, 2017, Friends of Cedar Mesa attended the in-person Section 106 consulting parties meeting held by BLM's Canyon Country District Office.

85.     On October 26, 2017 Friends of Cedar Mesa timely submitted detailed written comments on the BLM's draft Cultural Resources Review, raising concerns similar to those identified in its prior comments.

86.     On December 1, 2017, BLM issued a Notice of Competitive Lease Sale, which announced that BLM would offer all 43 parcels in the March 20, 2018 Lease Sale, triggering a

30-day protest period. BLM simultaneously issued a revised Draft EA, dated November 2017,

("November 2017 Draft EA") and an unsigned FONSI.

87.     BLM made no substantive revisions to address Friends of Cedar Mesa's concerns.

88.     On January 2, 2018, Friends of Cedar Mesa timely filed a formal administrative

protest against the March 2018 Lease Sale, raising issues similar to those identified in its prior

comments.

89.     On January 5, 2018, BLM issued its final Cultural Resources Review for the

March 2018 Lease Sale containing BLM's determination that the sale will have "No Adverse

Effect" on any historic resources in the lease area.

90.     Friends of Cedar Mesa submitted a letter of disagreement on BLM's finding on

February 14, 2018.

91.     BLM then requested that the Advisory Council on Historic Preservation (ACHP

or "Advisory Council") review its finding of No Adverse Effect, pursuant to 36 C.F.R. §

800.5(c)(2)–(3). The Advisory Council is an independent federal agency, created by the NHPA,

that advises the President and Congress on national historic preservation policy. Its members are

appointed by the President.

92.     On March 7, 2018, the Advisory Council on Historic Preservation concurred with

BLM's finding of No Adverse Effect, relying on a series of unproven assumptions, including: (1)

that BLM can locate any development away from specific historic properties identified on the

lease parcels; (2) that BLM will undertake a subsequent Section 106 review and consultation

process at the APD phase; (3) that BLM will consider, at the APD phase, whether some sites

currently found eligible under only Criterion D may in fact have broader significance or

comprise a cultural landscape; and (4) that BLM will consider, at the APD phase, potential

adverse effects to all contributing characteristics of eligible properties, including setting and feeling.

93.     BLM conducted the Lease Sale on March 20, 2018. All 43 parcels were sold.

94.     On May 14, 2018, BLM issued its Final EA for the March 2018 Lease Sale ("Final EA"), which relies on the same faulty facts and analysis from the two draft EAs and concludes, like the draft EAs, that BLM's March 2018 leasing will have no significant impact on the public lands and resources targeted by leasing.

95.     BLM again failed to prepare a Biological Assessment or consult with the Service over its Lease Sale, noting only that BLM "mailed a letter with information and the preliminary list [of potential listed species in the lease area] on May 5, 2017." Importantly, BLM did not determine that the proposed leasing would have "no effect" on these listed species, as required to side-step Section 7 consultation requirements.

96.     On May 17, 2018, Defendant Kent Hoffman issued his Decision Record approving the decision to lease all 43 leases and the signed FONSI, and Hoffman simultaneously dismissed or denied all outstanding protests on the sale.

97.     On October 25, 2018, Friends of Cedar Mesa sent BLM notice of its intent to sue BLM for violations of the Endangered Species Act.

**C.      Deficiencies in BLM's NHPA, NEPA, and ESA Compliance**

98.     BLM's March 2018 Utah Lease Sale places at risk a remarkable concentration of archaeological, cultural, and natural resources. The agency's process for considering such impacts was legally deficient in multiple respects.

a.  Arbitrary and Capricious Definition of "Area of Potential Effects"

99.     The NHPA requires agencies to delineate an Area of Potential Effects (APE) for each undertaking, defined as the area "within which an undertaking may directly or indirectly cause alterations in the character or use of historic properties." *Id.* § 800.16(d). Importantly, the APE should encompass "visual, atmospheric or audible" intrusions that may adversely impact a site's setting, feeling, and association. *Id*. § 800.5(a)(2)(iv), (v).

100.    In both the Cultural Resources Review and Final EA, BLM defined the APE for the March 2018 Lease Sale to include only the individual lease parcel boundaries plus a ½-mile buffer immediately surrounding each parcel.

101.    BLM failed to offer a rational explanation for its delineation of the APE, and record evidence demonstrates that this APE does not fully account for the likely "visual, atmospheric, and audible" intrusions and other indirect effects of oil and gas leasing.

102.    As for potential visual impacts, BLM assumed that vegetation, topography, and other modern development would camouflage all well facilities such that they would not be visible outside of a ½-mile radius. BLM offered no factual justification for this assumption and ignored record evidence demonstrating the assumption's inaccuracy.

103.    Friends of Cedar Mesa prepared and submitted a viewshed analysis, which showed that viewsheds for some historic resources extended many miles beyond BLM's preferred ½-mile buffer.  In fact, BLM's own viewshed analysis confirmed these conclusions. *See* Final EA at 50–65.

104.    BLM also overstated the extent of existing human degradation in the area and the extent to which future oil and gas development would blend into the existing landscape, while simultaneously downplaying its earlier finding that the landscape retains "high scenic quality."

*Compare* BLM, Cultural Resources Review, at 4 (Jan. 5, 2018), *with* Final EA at 29. BLM also

failed to incorporate or respond to Friends of Cedar Mesa's photographic evidence showing the

natural, undisturbed vistas surrounding key historic sites. This photographic evidence

demonstrates that oil and gas development would starkly contrast with the existing landscape.

105.    As for potential auditory impacts, BLM provided no evidence or analysis to

support its assertion that topographic complexity and well placement would ameliorate noise

impacts beyond (or within) the ½-mile buffer, and record evidence suggests that sounds will

travel much farther in this terrain.

106.    Additionally, the APE fails to examine other indirect effects attributable to access

roads and pipelines that would be needed to serve the lease parcels. Industrial traffic associated

with oil and gas operations can generate substantial amounts of windblown dust that has been

shown to obscure and deteriorate rock art. Road construction and improvement would also

increase public access to sensitive cultural resources, which has been shown to increase looting

and vandalism. By limiting the APE to an artificially constructed buffer around the lease parcels,

BLM fails to account for these indirect impacts which could occur well beyond BLM's chosen

½-mile buffer.

107.    In sum, BLM failed to articulate a rational basis for its choice of APE, failed to

consider all indirect effects in setting the APE, and reached a decision which runs counter to the

evidence before the agency.

b.    Failure to Make a Reasonable and Good Faith Effort to Identify Historic Properties

108.    Under the NHPA, BLM is required to make a "reasonable and good faith effort"

to identify the historic properties in the APE that may be impacted by its undertaking. 36 C.F.R.

§ 800.4(b)(1). This "may include background research, consultation, oral history interviews, sample field investigation, and field survey." 36 C.F.R. § 800.4(b)(1).

109.    BLM uses three types of inventories to identify the cultural resources within a geographic locale: (1) Class I review of all existing literature and information on historic properties in the project area; (2) Class II inventories that involve targeted or sample field investigations to project the probable density, diversity, and distribution of historic properties in the project area; and (3) Class III inventories that intensively survey the project area to identify and evaluate the historic properties. *See* BLM Manual MS-8110 at 8110. 21. The most frequently employed method is a Class III inventory. *See id.*

110.    Here, BLM relied on a Class I literature review and modelling to predict the probability that unidentified cultural resources are located within the APE, based on the limited existing survey data. BLM's models predicted high and medium probabilities across large swaths of the lease area, suggesting a high likelihood that ground surveys would discover additional eligible properties in the lease area.

111.    Despite the low survey coverage, and the high likelihood that unidentified historic properties are present in the lease area, BLM refused to perform any Class II or Class III inventories before approving the sale. As a result, a large portion of the Lease Sale area has *never* been surveyed for cultural resources. Existing survey coverage ranges by parcel from 2% to 55%, Final EA at 21, figures which are likely exaggerated by BLM's unsupported assumption that older surveys followed today's standard survey practices.

112.    BLM also failed to meaningfully incorporate GPS data and other cultural resource information provided by consulting parties about the locations of known sites not included in BLM's draft Cultural Resources Report.

113.     Individually and collectively, these failures demonstrate that BLM failed to make a reasonable and good faith effort to identify the eligible cultural sites within the APE.

c.   <u>Failure to Make National Register Eligibility Determinations</u>

114.     Under the NHPA, BLM is also required to apply the National Register eligibility criteria to potential historic properties identified in the APE. 36 C.F.R. § 800.4(c)(2). Even for previously-evaluated properties, "[t]he passage of time, changing perceptions of significance, or incomplete prior evaluations may require the agency official to reevaluate" a prior eligibility determination. *Id.*

115.     BLM evaded this essential step of the Section 106 process in at least two distinct ways.

116.     First, BLM refused to consider whether three areas identified by Friends of Cedar Mesa, within the immediate vicinity of the proposed leases, were eligible for listing as National Register "districts." These include Recapture/Mustang District, Alkali Ridge District, and Montezuma Canyon District. The record shows that these areas include large and interconnected prehistoric community centers, with groupings of both small and large sites that share common archaeological and cultural components, yet BLM never considered their interconnected nature.

117.     BLM also provided arbitrary and shifting rationales for its refusal to evaluate these districts. BLM first disavowed its obligation to consider district eligibility, then later argued that district eligibility would "not substantially change" its analysis, despite its own prior acknowledgment that historic districts are more susceptible to setting and feeling impacts than the individual sites they contain.

118.     BLM also failed to reevaluate outdated, incomplete, or inaccurate eligibility determinations that assigned National Register Criterion D (information potential) to sites

without having first considered whether Criterion A, B, or C might be more appropriate

determinations. In comments, Friends of Cedar Mesa and others noted that many sites should be

evaluated under these more protective criteria because of their size, complexity, and significance.

BLM never responded to such comments.

119.   BLM's failure to make these requisite eligibility determinations also fatally

undermined its subsequent No Adverse Effect determination, as National Register Districts and

Criterion A, B, and C sites require a more intensive analysis of adverse impacts.

    d.   <u>Failure to Address the National Park Service's Concerns Regarding Impacts to Hovenweep National Monument</u>

120.   The National Park Service (NPS) submitted numerous comments to BLM

regarding the potential for the March 2018 Lease Sale to affect national parks and monuments in

the southeastern Utah. The agency expressed specific concerns regarding Hovenweep National

Monument, which is a designated International Dark Sky Park, including: (1) a reduction in air

quality; (2) an increase in roads, well pads, and associated dust from vehicle traffic; (3) an

adverse impact on scenic views and visual resources; (4) a reduction in the quality of dark night

skies; (5) a reduction in the quality of natural soundscapes; and (6) adverse effects on the

quantity and quality of groundwater resources.

121.   Other groups echoed these concerns about light and noise impacts on Hovenweep

National Monument.

122.   Despite these serious and considered comments, BLM failed to conduct any

analysis of the potential impacts to night sky and soundscape qualities of Hovenweep National

Monument, prompting the NPS to stress that its "concerns . . . were not fully evaluated in the

EA" and request that BLM defer 13 parcels near Hovenweep National Monument.

COMPLAINT - 28

e.   Arbitrary and Capricious "No Adverse Effect" Determination

123.   BLM conceded that oil and gas development in the lease area "has the potential to impact cultural resources, both directly and indirectly." *See* Final EA at 40. While acknowledging the potential for impacts, BLM determined that they do not reach either the "significant" or "adverse effects" threshold. This conclusion runs contrary to the evidence in the record, fails to consider important aspects of the problem, and contradicts BLM's own decision in the February 2015 lease sale in this same region.

124.   First, BLM based this No Adverse Effect determination largely on an unsubstantiated assertion that there was space within each parcel to accommodate 10 acres of surface development without harming historic resources. Despite multiple consulting party requests, BLM failed to reveal its methodology for making this determination, violating its obligation to "ensure that a [Section 106] determination . . . is supported by sufficient documentation to enable any reviewing parties to understand its basis." 36 CFR 800.11

125.   Second, BLM failed to meaningfully address the potential visual impacts to the setting and feeling of listed and eligible historic sites. The agency failed to perform viewshed analyses for most National Register eligible sites, despite its own admission in the Cultural Resources Report for the February 2015 Utah lease sale that setting and feeling impacts must be assessed with a visual analysis. The few viewshed analyses BLM did perform, at the request of Friends of Cedar Mesa, confirm that large swaths of many parcels—up to 95%—would be visible from just a single viewpoint on several key sites. *See* Final EA at 50–65. BLM also failed to consider that many historic sites were intentionally situated on hilltops to achieve maximum visibility of the terrain below, undermining its assumption that viewshed impacts "can be avoided through judicious well pad placement."

126.     Third, BLM entirely ignored the potential for other important effects to historic properties, such as auditory impacts to the setting and feeling of historic sites; vandalism and looting resulting from improved public access; and increased rock art exposure to harmful dust resulting from increased traffic on roads.

127.     Fourth, without any supporting evidence or explanation, and contrary to its own research in the area, BLM asserted that previous leasing has not adversely affected historic resources. Friends of Cedar Mesa also provided extensive evidence to BLM showing that existing pumpjacks and storage tanks in the region can be seen and heard from historic sites, which adversely affects the setting and feeling of these resources. BLM failed to respond to this showing.

128.     Finally, BLM relied heavily on the availability of protective lease stipulations to avoid adverse effects, but BLM never considered that these stipulations are discretionary and subject to broad exceptions. Unlike "No Surface Occupancy" stipulations, which permit BLM to bar all exploration and development of a parcel, BLM's cultural stipulations do not allow BLM to prohibit development of a parcel altogether, even where necessary to avoid impacts to cultural resources. These lease stipulations therefore do not provide a basis for BLM's No Adverse Effect determination.

129.     BLM's No Adverse Effect determination is especially problematic where the agency came to a starkly different conclusion for a prior lease sale in the same area. In February 2015, BLM proposed leasing parcels in essentially the same area, many directly adjacent to or overlapping the March 2018 parcels. *See supra* ¶ 69. BLM concluded that leasing would likely result in adverse effects to the most culturally dense parcels and ultimately deferred 36 of the 53 parcels proposed for the sale. As Friends of Cedar Mesa commented, the site densities of most of

COMPLAINT - 30

the March 2018 lease parcels exceed those of the 2015 lease parcels. Nothing has changed since 2015 to decrease the likelihood of adverse effects.

130.    For all these reasons, BLM's No Adverse Effect determination was arbitrary, capricious, and contrary to law. Moreover, because BLM reached a No Adverse Effect finding, it failed to take further steps required under the NHPA, such as working with consulting parties to develop mitigation measures.

f.    <u>Failure to Consider a Reasonable Range of Alternatives</u>

131.    NEPA requires federal agencies to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(C)(iii), 4332(E); *see also* 40 C.F.R. § 1508.9.

132.    BLM considered only a "no action" and a "leasing" alternative in approving the March 2018 Lease Sale. It summarily rejected the "no action" alternative, after determining that it "would not comply with Mineral Leasing Act's requirement for each State to hold quarterly lease sales." Final EA at 32. This decision was legally incorrect as the Mineral Leasing Act only requires BLM to hold quarterly lease sales where parcels are *available* for leasing, 30 U.S.C. § 226(b)(1)(A), and BLM is not required to make available any of the nominated lease parcels. Therefore, the no action alternative would not violate the MLA's quarterly lease sale requirement.

133.    BLM also failed to consider any alternatives in between "leasing" and "no-leasing," including partial deferrals or additional stipulations to protect sensitive resources. For example, commenting parties—including BLM's sister federal agency, the National Park Service—requested that BLM consider various alternatives that would defer or impose NSO

stipulations on culturally or ecologically sensitive parcels. BLM summarily rejected each

proposed alternative without providing a rational explanation.

g.  Failure to Initiate and Reinitiate ESA Consultation over Impacts to Listed
Species

134.  The ESA requires BLM to consult with the U.S. Fish and Wildlife Service if any

action "may affect" a threatened or endangered species. 16 U.S.C. § 1536(b); 50 C.F.R. §

402.12.

135.  In its EA, BLM did *not* conclude that its oil and gas leasing decision would fall

below the statutory "may affect" standard requiring consultation over the potential impacts of

leasing on Mexican spotted owl, Southwestern willow flycatcher, Yellow-billed cuckoo, and the

Colorado River fishes. Instead, BLM concluded only that its promise to conduct future analysis

and mitigation will adequately mitigate impacts. *See* Final EA, App. E, at 31-32. This is an

incorrect legal standard under the ESA, and BLM cannot avoid consulting with the Service under

this approach.

136.  BLM also erred in relying on a 2008 programmatic consultation regarding the

Monticello Resource Management Plan to meet its ESA obligations for Mexican spotted owl,

Southwestern willow flycatcher, and Colorado River fishes. During this earlier consultation,

BLM acknowledged that oil and gas leasing and other actions approved under the Monticello

Resource Management Plan "may affect" and were "likely to adversely affect" these listed

species. To avoid a jeopardy finding—which would have required modifying or abandoning

certain actions permitted in the RMP—BLM agreed to a series of monitoring requirements and

resource protection measures for all subsequent implementation decisions, including oil and gas

leasing. BLM failed to adhere to the monitoring and protective measures, thus foreclosing

reliance on this dated consultation for ESA coverage.

137.     BLM also violated the ESA in refusing to initiate consultation over the potential impacts of oil and gas leasing on the Yellow-billed cuckoo, which was recently protected under the ESA as a threatened species. An agency is required to initiate or reinitiate consultation if a new species is listed or critical habitat designated that may be affected by the identified action. 50 C.F.R. § 402.16. The Service listed the cuckoo as a threatened species in 2014. Since that time, BLM has failed to reinitiate consultation over the impacts of continued implementation of the Monticello RMP on the cuckoo, and BLM has similarly failed to consult over the impacts of its March 2018 oil and gas leasing decision on the cuckoo.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### (Violation of the NHPA and APA)

138.     Plaintiff incorporates by reference all preceding paragraphs.

139.     BLM's March 2018 Lease Sale and issuance of oil and gas leases constitutes an undertaking under the NHPA that has the potential to affect historic properties.

140.     BLM's Section 106 Process and associated Cultural Resources Review for the March 2018 Lease Sale violated the NHPA in the following ways, each of which is a distinct and separate violation of law:

  a.  BLM's APE for the March 2018 Lease Sale was arbitrarily defined and excluded many historic properties that could be affected by the undertaking;

  b.  BLM failed to make a reasonable and good faith effort to identify historic properties within this Area of Potential Effects prior to approving the March 2018 Lease Sale;

  c.  BLM failed to consider information provided by consulting parties about the nature and location of potentially eligible historic resources;

d.   BLM failed to conduct eligibility determinations of potentially National Register-eligible districts and landscapes identified during the Section 106 process;

e.   BLM failed to reevaluate outdated, incomplete, or inaccurate eligibility determinations;

f.   BLM's Cultural Resources Review failed to acknowledge or adequately analyze the probable adverse effects of the March 2018 Lease Sale on historic properties;

g.   BLM's determination of No Adverse Effect relies on unsupported assumptions, instead of substantive analysis, and ignores several potential adverse effects that BLM itself identified in the Final EA, such as the impacts of dust on rock art and the potential for improved road access to increase increased looting and vandalism;

h.   BLM failed to provide sufficient information to allow consulting parties, tribes, and the public to understand the basis for its No Adverse Effect finding; and

i.   BLM disregarded its own prior determination that oil and gas leasing in this landscape would likely result in adverse effects to historic resources.

141.   These failures, in turn, prevented BLM from taking further steps required under the NHPA, such as identifying avoidance or mitigation measures.

142.   For the foregoing reasons, BLM's authorization of the March 2018 Lease Sale and subsequent lease issuance is arbitrary, capricious, an abuse of discretion, and not in accordance with law under the NHPA, APA, and their implementing regulations.

**SECOND CLAIM FOR RELIEF**
**(Violation of NEPA and the APA – Failure to Prepare an EIS)**

143.   Plaintiff incorporates by reference all preceding paragraphs.

144.    NEPA requires the preparation of an EIS for all "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).

145.    BLM's decisions to offer tens of thousands of acres for oil and gas development, in an area filled with important cultural and ecological resources, is a major federal action with the potential to significantly affect the quality of the human environment.

146.    Numerous factors requiring preparation of an EIS are present here. Among these are the "[u]nique characteristics of the geographic area such as proximity to historic or cultural resources, park lands," "[t]he degree to which the action may adversely affect districts, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historical resources[,]" "[t]he degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973," and the controversial and uncertain nature of the likely effects. 40 C.F.R. § 1508.27(b). The presence of any of these factors renders BLM's decision to not prepare an EIS arbitrary, capricious, and contrary to law.

147.    For all these reasons, BLM's Finding of No Significant Impact (FONSI) and decision to forego preparing an EIS before approving the March 2018 Utah March 2018 Lease Sale were arbitrary, capricious, an abuse of discretion, not in accordance with law, and without observance of procedure required by law, within the meaning of the judicial review provisions of the APA, and must be held unlawful and set aside under 5 U.S.C. § 706.

**THIRD CLAIM FOR RELIEF**
**(Violation of NEPA and the APA – Preparation of an Unlawful EA)**

148.    Plaintiff incorporates by reference all preceding paragraphs.

149.    Pursuant to NEPA and its implementing regulations, BLM must take a "hard look" at the direct, indirect, and cumulative environmental impacts of a proposed action before the agency makes any irreversible and irretrievable commitment of resources.

150.    The issuance of an oil and gas lease without a No Surface Occupancy (NSO) Stipulation is an irreversible and irretrievable commitment of resources.

151.    NEPA also requires federal agencies to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." *Id.* § 4332(2)(E).

152.    BLM failed to take the requisite hard look at the direct, indirect, and cumulative impacts of the March 2018 Lease Sale on cultural and natural resources before approving the sale and issuing leases, in violation of the "hard look" requirements of NEPA and its implementing regulations.

153.    BLM arbitrarily and capriciously eliminated from consideration all reasonable alternatives between the "leasing" and "no-leasing" extremes, including those raised by commenting parties. BLM also offered a legally erroneous conclusion for its rejection of the "no action" alternative, thereby foreclosing any meaningful consideration of that alterative.

154.    For the foregoing reasons, BLM's preparation and approval of the Final EA, Decision Record, and FONSI for the March 2018 Lease Sale sale was arbitrary, capricious, and not in accordance with NEPA, the APA, or their implementing regulations.

**FOURTH CLAIM FOR RELIEF**
**(Violation of ESA and the APA – Failure to Consult)**

155.    Plaintiff incorporates by reference all preceding paragraphs.

156.    Section 7(a)(2) of the ESA requires agencies to consult with the U.S. Fish and Wildlife Service before taking an action that "may affect" a listed species or the species' critical habitat. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(a).

157.    BLM's approval of the March 2018 Lease Sale is an action that "may affect" Mexican spotted owl, Southwestern willow flycatcher, Yellow-billed cuckoo, and the Colorado River fishes, and their critical habitats. Accordingly, BLM is required to consult with the U.S. Fish and Wildlife Service to ensure that its oil and gas leases will not jeopardize any listed species or adversely modify critical habitat.

158.    BLM's failure to consult with the Service prior to approving the March 2018 Lease Sale violates its section 7 duty to consult under the ESA.

159.    BLM's approval and issuance of the March 2018 Lease Sale without first completing consultation violates the ESA, 16 U.S.C. § 1536(a)(2), and its implementing regulations, and is arbitrary, capricious, and not in accordance with law, 5 U.S.C. §§ 701-706.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays that this Court grant the following relief:

(1)    Declare that Defendants violated the NHPA, NEPA, ESA, APA, and/or their implementing regulations in approving the March 2018 Lease Sale;

(2)    Declare unlawful and vacate the March 2018 Lease Sale Decision Record, FONSI, EA, and Cultural Resources Review;

(3)    Reverse and set aside any leases, permits, or approvals issued in reliance on the foregoing March 2018 Lease Sale documents or decisions;

(4)    Enter such preliminary and/or permanent injunctive relief as Plaintiff may pray for hereafter;

COMPLAINT - 37

(5)     Award Plaintiff's costs incurred in pursuing this action, including attorney's fees,

as authorized by the Endangered Species Act, 16 U.S.C. § 1540(g)(4), Equal Access to Justice

Act, 28 U.S.C. § 2412(d), and other applicable provisions; and

(6)     Grant such other and further relief as the Court deems just and proper.


Dated: February 6, 2019                    Respectfully submitted.

                                          /s/ *Todd C. Tucci*
                                          Todd C. Tucci (Idaho Bar # 6526)*
                                          Sarah Stellberg (Idaho Bar # 10538)*
                                          *pro hac vice* applications pending
                                          ADVOCATES FOR THE WEST
                                          P.O. Box 1612
                                          Boise, ID 83702
                                          (208) 724-2142
                                          ttuci@advocateswest.org
                                          sstellberg@advocateswest.org


                                          /s/ *Aaron Garrett*
                                          Aaron Garrett (Utah Bar # 12519)
                                          Nonprofit Legal Services of Utah
                                          177 East 900 South, Suite 202
                                          Salt Lake City, UT 84111
                                          (385) 419-4111
                                          aaron@nonprofitlegalservices.com

                                          *Attorneys for Plaintiff Friends of Cedar
                                          Mesa*

COMPLAINT - 38