Todd C. Tucci (Idaho Bar # 6526) (*admitted pro hac vice*)
Sarah K. Stellberg (Idaho Bar # 10538) (*admitted pro hac vice*)
ADVOCATES FOR THE WEST
P.O. Box 1612
Boise, ID 83701
(208) 342-7024
(208) 342-8286 (fax)
ttucci@advocateswest.org
sstellberg@advocateswest.org

Attorneys for Plaintiff *Friends of Cedar Mesa*

Stephen H.M. Bloch (UT #7813)
Landon Newell (UT #14738)
SOUTHERN UTAH WILDERNESS ALLIANCE
425 East 100 South
Salt Lake City, UT 84111
(801) 486-3161
steve@suwa.org
landon@suwa.org

Attorneys for Plaintiff *Southern Utah Wilderness Alliance*

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH,
SOUTHERN REGION OF THE CENTRAL DIVISION

| | |
|---|---|
| FRIENDS OF CEDAR MESA,<br><br>        Plaintiff,<br><br>v.<br><br>U.S. DEPT. OF THE INTERIOR et al.,<br><br>        Defendants. | **PLAINTIFFS' JOINT RESPONSE TO DEFENDANTS' MOTION TO DISMISS**<br><br><br>Case No. 4:19-cv-00013-DN-PK<br>Case No. 2:19-cv-00266-DN |
| SOUTHERN UTAH WILDERNESS ALLIANCE,<br><br>        Plaintiff,<br><br>v. | District Judge David Nuffer<br>Magistrate Judge Paul Kohler |

| DAVID BERNHARDT et al., | |
| Defendants. | |

## INTRODUCTION

The Friends of Cedar Mesa ("Friends") and Southern Utah Wilderness Alliance ("SUWA") (collectively, "Plaintiffs") respectfully submit this Joint Response to Defendants' Motion to Dismiss[1] ("Motion") in the above-captioned consolidated matter.

Defendants' Motion lacks merit for three reasons. First, "final agency action" for purposes of judicial review under the Administrative Procedure Act ("APA") is a party-based principle under which one party may seek administrative relief while a separate party simultaneously seeks judicial relief of the same agency decision. Thus, the March 2018 leases are properly before this Court. Second, the case is not moot as the Court can still grant effective relief to Plaintiffs. At most, Defendants have taken steps to address one of the several causes of action in this matter. Finally, even if Plaintiffs' claims are moot, the voluntary cessation exception to mootness applies. Defendants have not met their burden of (1) making it "absolutely clear" that the alleged violations cannot be reasonably expected to recur, and (2) demonstrating that all alleged adverse effects have been "completely and irrevocably" eradicated.

## BACKGROUND

### Plaintiffs' Challenges

These consolidated cases involve two separate decisions by the Bureau of Land Management ("BLM") to offer, sell, and issue thirty-six oil and gas leases on public lands in southeastern Utah. These are some of the most culturally and archaeologically rich public lands

---

[1] Docket No. 40, filed August 8, 2019.

in Utah, and the nation. Located on the doorsteps to Canyons of the Ancients and Hovenweep National Monuments the leases encompass well-preserved evidence of past peoples and cultures including cliff dwellings, pueblos, kivas, petroglyph and pictograph panels, ancient roads, and Chaco-era (circa 900-1150 A.D.) "great houses."

Friends filed its complaint challenging the Utah-BLM March 2018 lease sale on February 6, 2019[2], and an amended complaint on May 17, 2019.[3] Friends' amended complaint included the following causes of action:

- Failure to make a reasonable and good faith identification effort and to assess adverse effects, among other violations of the National Historic Preservation Act ("NHPA"), 54 U.S.C. §§ 300101-320303.[4]

- Failure to prepare an environmental impact statement ("EIS") in violation of the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4370h.[5]

- Failure to consider a reasonable range of alternatives to its proposed action, and to take a "hard look" and all impacts of the lease sale on (1) cultural and archaeological resources, (2) nearby National Monuments, (3) threatened and endangered wildlife, and other resources, in violation of NEPA.[6]

- Failure to consult with the United States Fish and Wildlife Service in violation of the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531-1544.[7]

Friends requested that the Court "vacate" the March 2018 lease sale decision record ("DR"), finding of no significant impact ("FONSI"), leasing EA ("March 2018 Lease Sale EA"), and the Cultural Resources Review prepared for that sale.[8] Friends requested further that the court "[r]everse and set aside" the March 2018 leases.[9]

---

[2] Docket No. 2, filed February 2, 2019.
[3] Docket No. 28, filed May 17, 2019.
[4] *Id.* ¶¶ 147-52.
[5] *Id.* ¶¶ 153-57.
[6] *Id.* ¶¶ 158-64.
[7] *Id.* ¶¶ 165-69.
[8] *Id.* at 40.
[9] *Id.*

SUWA filed a complaint challenging the Utah-BLM March 2018 lease sale as well as the December 2018 lease sale on April 19, 2019.[10] SUWA's complaint included the following causes of action:

- Failure to analyze reasonably foreseeable greenhouse gas ("GHG") emissions and climate change impacts, in violation of NEPA.[11]

- Failure to analyze cumulative impacts of oil and gas leasing and development to: (1) Bears Ears, Canyons of the Ancients, and Hovenweep National Monuments, (2) lands with wilderness characteristics, (3) cultural and archaeological resources, (4) the Alkali Ridge Area of Critical Environmental Concern ("ACEC"), and (5) GHG emissions and climate change, in violation of NEPA.[12]

- Failure to provide an opportunity for the public to review and/or comment on the December 2018 lease sale, in violation of NEPA and the Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. §§ 1701-1787.[13]

SUWA requested that the Court "vacate" the March 2018 Lease Sale EA and accompanying FONSI-DR.[14] SUWA likewise requested that the Court "vacate" the December 2018 lease sale Determination of NEPA Adequacy ("December 2018 Lease Sale DNA") and accompanying DR.[15] SUWA requested further that the Court "[s]et aside and vacate" all challenged oil and gas leases issued at the March and December 2018 lease sales.[16]

### Defendants' Decision to Suspend the Leases

On July 16, 2019, Defendants filed a motion, asserting, "[t]hirty-six oil and gas leases are at issue in this case and BLM plans to suspend all 36 oil and gas leases."[17] This includes all the leases challenged by Plaintiffs from the March and December 2018 lease sales. Defendants

---

[10] Docket No. 2 (in *S. Utah Wilderness All. v. Bernhardt* et al, 2:19-cv-00266-RJS), filed April 19, 2019.
[11] *Id.* ¶¶ 75-82.
[12] *Id.* ¶¶ 83-89.
[13] *Id.* ¶¶ 90-93.
[14] *Id.* at 25-26.
[15] *Id.*
[16] *Id.* at 26.
[17] Docket No. 37 at 1, filed July 16, 2019.

subsequently suspended the December 2018 leases[18] in order to prepare curative NEPA analysis with regard to GHG emissions and climate change impacts.[19] According to Defendants, BLM was compelled to take this action "[b]ased on the parallels between the current [case] and [the decision in *WildEarth Guardians v. Zinke*, 368 F. Supp. 3d 41 (D.D.C 2019)]."[20] Specifically, the court in *WildEarth Guardians* "found that the NEPA documents the BLM relied on in offering and selling [certain oil and gas] leases did not adequately assess potential impacts involving [GHG] emissions and climate change."[21]

When it suspended the December 2018 leases BLM made only two commitments: (1) to complete "appropriate environmental analyses under NEPA," and after such analysis is completed to (2) "issue a new decision concerning this suspension of operations and production (SOP) of [the suspended leases]."[22]

On August 8, 2019, Defendants filed their Motion to dismiss this action claiming lack of "final agency action" (with regard to the March 2018 leases) and that Plaintiffs' challenges were moot.[23] Defendants first argue that the March 2018 lease sale are not "final agency actions" because a third-party—who is <u>not</u> a party to this litigation—has a pending appeal of that leasing decision before the Interior Board of Land Appeals ("IBLA"). Defendants claim that unless and until the IBLA grants Defendants' pending motion to remand in that IBLA appeal <u>no other party</u>, including Plaintiffs, can challenge that March 2018 lease sale in federal court.[24]

---

[18] To date, Defendants have not suspended the March 2018 leases. *See* Motion at 5 (explaining that BLM will suspend the leases once the Interior Board of Land Appeal returns jurisdiction over them).

[19] *See generally* Docket No. 40-3, filed August 8, 2019.

[20] *Id.* at 1.

[21] *Id.*

[22] *Id.* It is immaterial that Defendants' in their Motion claim – without support – that after completing the curative NEPA analysis BLM will "will issue a new decision as to each lease that may: (1) cancel the lease; (2) modify it; or (3) lift the suspension without modification." Motion at 5. This assertion is not supported by the record.

[23] *See generally* Motion.

[24] *Id.* at 6–8.

As to the second point, based on its two narrow commitments Defendants assert that the alleged violations have been completely and irrevocably eradicated, thus rendering this matter moot.[25] Defendants make this assertion even though they have not committed to: cancel the leases; address Plaintiffs' NHPA, ESA, or FLPMA claims; or withdraw the March 2018 Lease Sale EA and accompanying FONSI-DR or the December 2018 Lease Sale DNA and DR.

As discussed below, Defendants' Motion is without merit and should be denied.

## I.      THE MARCH 2018 LEASES ARE "FINAL AGENCY ACTION."

Judicial review of claims brought under the APA is limited to "final agency action."[26] Defendants allege that the March 2018 leases are not "final" because another conservation organization, WildEarth Guardians, who is not a party to this case, has administratively appealed those leases to the IBLA. However, it is well-settled that that one party's administrative appeal of a decision does not render that decision non-final as to other parties.

Defendants cite a single case, *Acura of Bellevue v. Reich*,[27] in support of their position that no final agency action exists. *Reich* is inapplicable here. In that case, the same party simultaneously pursued both an administrative challenge and a federal court action challenging the same agency decision. The court rejected this approach, and held that a party cannot seek simultaneous agency reconsideration and judicial review of the same issue.[28] *Reich* is inapposite as it did not address whether a third party's administrative appeal of an agency's action renders that action "non-final" as to all possible litigants.[29]

---

[25] *Id.* at 8-14.
[26] *See* 5 U.S.C. § 704.
[27] 90 F.3d 1403 (9th Cir. 1996).
[28] *Id.* at 1407–08.
[29] *See* *Ninilchik Traditional Council v. Towarak*, Case No. 3:15-cv-00205-JWS, 2016 WL 1559122, at *6 (D. Alaska April 17, 2016) (distinguishing *Reich* as "not on all fours" because it failed to "address[] the question presented by Defendants: whether one party's administrative appeal of an agency's action renders that action nonfinal as to all third parties").

Every court to have considered this issue has answered in the negative—a fact which Defendants conspicuously ignore. The Third,[30] Fifth,[31] Eighth,[32] Ninth,[33] and D.C.[34] Circuits have held that finality under the APA is a "party-based concept." This means "[i]f a party has sought only judicial review, the agency action can be deemed final and hence reviewable as to that party, regardless of whether other parties have moved for administrative reconsideration."[35] An agency decision may therefore "be final with respect to some parties but nonfinal with respect to other parties."[36] Although the Tenth Circuit has not directly ruled on this issue, its recent decision in *Farrell-Cooper Mining Company v. U.S. Department of Interior* supports this party-based concept of finality.[37]

Numerous policy considerations support the party-based concept to final agency action. First, it "serves the interests of fairness by allowing parties seeking judicial review to get it, rather than making them dependent on the whims of other parties."[38] As the Third Circuit persuasively explained, "[i]f any party could render an action nonfinal for all, simply by filing a petition for reconsideration, . . . parties seeking immediate judicial relief would be forced to wait until the agency disposed of the reconsideration petitions filed by others."[39] Second, this approach furthers Congress' intent under the APA to relieve parties of the obligation to request administrative review before seeking judicial relief.[40] This goal would be frustrated if one party's

---

[30] *W. Penn Power Co. v. U.S. Envtl. Prot. Agency*, 860 F.2d 581, 587 (3d Cir. 1988).

[31] *City of Arlington, Tex. v. F.C.C.*, 668 F.3d 229, 238 (5th Cir. 2012), aff'd, 569 U.S. 290 (2013).

[32] *Winter v. Interstate Commerce Comm'n*, 851 F.2d 1056, 1062 (8th Cir. 1988).

[33] *Public Citizen, Inc. v. Mineta*, 343 F.3d 1159, 1170 (9th Cir. 2003).

[34] *ICG Concerned Workers Ass'n v. United States*, 888 F.2d 1455, 1457–58 (D.C. Cir. 1989).

[35] *Id.* at 1457–58.

[36] *Id.* at 1458; *see also W. Penn*, 860 F.2d at 587; *Winter*, 851 F.2d at 1062.

[37] 864 F.3d 1105, 1117 (10th Cir. 2017) ("[i]n multi-party proceedings . . . some may seek judicial review and others may seek administrative reconsideration.") (quoting *Am. Farm Lines v. Black Ball Freight Serv.*, 397 U.S. 532, 541 (1970), a case often cited as supporting supports the "party-based concept" of finality.)

[38] *W. Penn*, 860 F.2d at 586.

[39] *Id.* at 587.

[40] *Id.* at 585.

decision to file an administrative appeal forced that step on all others, thus foreclosing immediate judicial review.[41]

Under this well-established approach to APA finality, WildEarth Guardians' pending IBLA appeal does <u>not</u> render the March 2018 leases non-final as to the Plaintiffs here. The Court should therefore deny Defendants' Motion on this ground.

**II.    PLAINTIFFS' CHALLENGES ARE NOT MOOT.**

Plaintiffs' challenges are not moot because there is still a live controversy for which the Court can grant effective relief. Even if the Court concludes these clams are moot, the "voluntary cessation" exception to mootness applies here as Defendants fail to meet their burden of (1) making it "absolutely clear" that the alleged violations cannot be reasonably expected to recur, and (2) demonstrating that all alleged adverse effects have been "completely and irrevocably" eradicated.

**A.  Plaintiffs' Challenges Are Not Moot Because the Court Can Still Provide Effective Relief.**

Defendants bear a "heavy"[42]  and "formidable"[43] burden of proving mootness. In "[d]eciding whether a case is moot, the crucial question is whether granting a present determination of the issues offered will have some effect in the real world. When it becomes impossible for a court to grant effective relief, a live controversy ceases to exist, and the case becomes moot."[44] "To determine whether any claim remains for review, [the court] must ascertain what type of relief the [Plaintiffs] seek, and whether [the court] can, at this juncture,

---

[41] *Id.*
[42] *Cnty of Los Angeles v. Davis*, 440 U.S. 625, 631 (1978).
[43] *Brown v. Buhman*, 822 F.3d 1151, 1166 (10th Cir. 2016).
[44] *Abdulhaseeb v. Calbone*, 600 F.3d 1301, 1311 (10th Cir. 2010) (quotations and citation omitted).

afford them meaningful relief."[45] For the purposes of mootness analysis, "'any effective relief whatever' is expansively defined."[46]

This case is not moot because there is still a live controversy for which the Court can grant effective relief. BLM only temporarily suspended the challenged leases and committed to self-correct just one of the violations Plaintiffs allege—the lack of sufficient NEPA analysis on GHG emissions and climate change. BLM has not vacated the challenged leases or supporting decision documents. It also has not agreed to remedy Plaintiffs' remaining ESA, NHPA, FLPMA, and NEPA violations.

This Court can grant effective relief here. For example, the Court could order BLM to consult with the U.S. Fish and Wildlife Service over potential impacts to ESA species. It could direct BLM to provide additional opportunities for public involvement in the December 2018 lease sale. It could order BLM to prepare an EIS for the March 2018 lease sale that studies a wider range of alternatives. It could order BLM to take the requisite "hard look" at impacts to cultural and archaeological resources, National Monuments, the Alkali Ridge ACEC, and other resources affected by the March and December 2018 lease sales. It could also vacate the challenged leases, March 2018 Lease Sale EA and FONSI-DR, December 2018 Lease Sale DNA and DR, and Cultural Resources Review. Thus, contrary to Defendants' assertion, Defendants have not received "all the relief the federal court could have given [them]."[47]

---

[45] _Rio Grande Silvery Minnow v. Bureau of Reclamation_, 601 F.3d 1096, 1110 (10th Cir. 2010) (citing _S. Utah Wilderness All. v. Smith_, 110 F.3d 724, 727 (10th Cir. 1997)).
[46] _Ctr. for Food Safety v. Salazar_, 900 F. Supp. 2d 1, 5 (D.D.C. 2012) (citing _City of Erie v. Pap's A.M._, 529 U.S. 277, 287 (2000)).
[47] Motion at 10 (alteration in original) (quoting _Wyoming v. U.S. Dep't of the Interior_, 587 F.3d 1245, 1250 (10th Cir. 2009) (citations and quotations omitted).

9

The cases Defendants cite are inapposite. First, in *Southern Utah Wilderness Alliance* ("*SUWA I*")[48] the defendants asserted in a declaration submitted with their motion to dismiss that BLM's remedial analysis would potentially self-correct the alleged violations, a condition not present here.[49] In that case, SUWA alleged that BLM failed to comply with NEPA in approving an oil and gas lease sale. The government suspended the leases and agreed to conduct supplemental NEPA analysis remedying the deficiencies SUWA raised. The court found that it could grant no further relief beyond what BLM voluntarily provided and dismissed the case as moot.[50] In contrast with *SUWA I*, there are a number of violations here—under the ESA, FLPMA, NHPA, and NEPA—that BLM's supplemental analysis will not remedy, and for which the Court can still grant effective relief.

*SUWA I* was also premised on the Court's determination that a suspended lease does not constitute an "irreversible and irretrievable commitment of resources" triggering NEPA.[51] However, subsequent cases have made clear that the point of irretrievable and irreversible commitment occurs at lease issuance.[52] Once issued, an oil and gas lease conveys the "right to use so much of the leased lands as is necessary to explore for, drill for, mine, extract, remove and dispose of all the leased resource in a leasehold."[53] Lease suspension merely pauses surface development (along with the 10-year lease term and lessee's obligation to pay rent)[54] but it does

---

[48] *S. Utah Wilderness All. v. U.S. Dep't of Interior*, No. 2:06-CV-342-DAK, 2007 WL 2220525, at *2 (D. Utah July 30, 2007) (unpublished).

[49] Docket No. 57-2 (in *SUWA I*), filed November 06, 2006.

[50] *SUWA I*, at *2.

[51] *Id.*

[52] *See, e.g.*, *New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 718 (10th Cir. 2009) ("we conclude that issuing an oil and gas lease without an NSO stipulation constitutes such a[n an irretrievable] commitment"); *see also* BLM, H-1624-1 – Planning for Fluid Mineral Resources § I.B.2, at I-2 (Jan. 28, 2013) ("By law, these impacts must be analyzed before the agency makes an irreversible commitment. In the fluid minerals program, this commitment occurs at the point of lease issuance.").

[53] 43 C.F.R. § 3101.1-2.

[54] *Id.* § 3103.4-4(b).

not revoke the lessee's right to occupy and develop the parcel <u>at some point</u>. BLM cannot

"annul" this irretrievable commitment of resources with anything less than lease cancellation.

This case is also unlike *Rio Grande*[55] and *Southern Utah Wilderness Alliance* ("*SUWA*

*II*")[56] in which the challenged decisions were withdrawn and replaced by new, superseding

decisions. For example, in *Rio Grande*, the Tenth Circuit held that a challenge to two ESA

Biological Opinions was moot where, following the filing of the lawsuit, defendants issued a

superseding Biological Opinion.[57] The court explained that the superseding "[Biological

Opinion] establishes a new regulatory framework under which the propriety of [the agency's]

actions must be judged."[58] The Court could no longer grant any effective relief because a

decision about the prior Biological Opinions would have been "wholly without effect in the real

world."[59]

Similarly, in *SUWA II*, the court held that a NEPA and FLPMA challenge to certain oil

and gas drilling permits ("APDs") was moot where the defendants withdrew their APD

approvals and agreed to conduct a new decisionmaking process.[60] The court noted that "[a]s a

result [of Defendants withdrawal of the APD approvals], the 'precise issue' that Plaintiffs seek to

adjudicate (i.e., the adequacy of air quality protections in the original APDs) 'is no longer extant'

and will only recur in the context of an entirely new decisionmaking process. . . ."[61] Thus, the

court could no longer grant any effective relief.

In contrast here, BLM has withdrawn none of the challenged decisions or documents.

The oil and gas leases still exist. The challenged EA, DNA, Cultural Resources Report, and

---

[55] *Rio Grande*, 601 F.3d at 1110–15.
[56] <u>*S. Utah Wilderness All. v. U.S. Dep't of the Interior*</u>, 250 F. Supp. 3d 1068 (D. Utah 2017).
[57] *Rio Grande*, 601 F.3d at 1110-15.
[58] *Id.* at 1111.
[59] *Id.* at 1112.
[60] *SUWA II*, 250 F. Supp. 3d at 1085–92.
[61] *Id.* at 1090–91 (quoting *Rio Grande*, 601 F.3d at 1119).

Decision Records are still effective. In fact, Defendants continue to rely on these same analyses to authorize additional oil and gas leasing decisions in this same area.[62] Thus, the precise issues Plaintiffs seek to litigate are still "extant" and will not occur in the context of "an entirely new decisionmaking process."[63] An adjudication of these issues will therefore "have some effect in the real world."[64]

This case is more akin to *Colorado Environmental Coalition v. Office of Legacy Management*, which dealt with a challenge to uranium leasing and development on public lands in southwestern Colorado.[65] The plaintiffs raised various claims under NEPA, including that an EIS should have been prepared.[66] After the litigation had been filed, the defendant agency signaled its intent to prepare an EIS and then claimed that such action mooted plaintiffs' NEPA challenge.[67] The court disagreed, in part because the defendant had not withdrawn its existing NEPA analysis or decision record, or cancelled the challenged leases—actions expressly demanded and prayed for by plaintiffs.[68] On this point, the court stated: "[Defendant] could have likely rendered this action . . . moot . . . by withdrawing the EA and FONSI and rescinding the 31 leases. It chose not to do so, and so the final actions challenged by Plaintiffs are still properly before the Court."[69]

In sum, Plaintiffs have claims and prayers for relief that have not been—and will not be—addressed by the temporary lease suspension and curative NEPA analysis put in place and

---

[62] *See infra* § II.B.ii.
[63] *SUWA II*, 250 F. Supp. 3d at 1091.
[64] *Rio Grande*, 601 F.3d at 1110 (internal quotations and emphasis omitted).
[65] 819 F. Supp. 2d 1193 (D. Colo. 2011).
[66] *Id.* at 1201-02.
[67] *Id.* at 1202–03.
[68] *Id.* at 1205.
[69] *Id.*

promised by BLM. Because the Court can grant effective relief in this matter, Plaintiffs

challenges are not moot. Defendants' Motion should be denied on this basis.

### B.  The Voluntary Cessation Exception to Mootness Applies.

Even if Defendants are correct that this Court can grant no effective relief here, a point

Plaintiffs do not concede, this Court must still deny the Motion because the "voluntary

cessation" exception to mootness applies. A defendant's "voluntary cessation of challenged

conduct does not ordinarily render a case moot because a dismissal for mootness would permit a

resumption of the challenged conduct as soon as the case is dismissed."[70] A defendant seeking to

moot a case based on voluntary cessation carries a "heavy" and "stringent" burden[71] of

establishing both (1) that it is "absolutely clear" that the allegedly wrongful behavior could not

reasonably be expected to recur,[72] and (2) that interim relief or events have "completely and

irrevocably eradicated the effects of the alleged violation."[73] Contrary to Defendants' assertion,

the Tenth Circuit has not held that this burden is "much less stringent" when applied to the

federal government.[74]

Defendants have failed to meet this standard. The first prong is not met because

Defendants' narrow commitments fail to make "absolutely clear" that the legal violations will be

remedied once BLM lifts the lease suspension, or that the leases will be permanently cancelled.

The second prong is not met because the mere existence of the challenged leases (even while

suspended) and flawed NEPA analysis continues to harm Plaintiffs.

---

[70] *Knox v. SEIU, Local 1000*, 567 U.S. 298, 307 (2012).

[71] *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000).

[72] *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 n.10 (1982).

[73] *Rio Grande*, 601 F.3d at 1115.

[74] *Compare* Motion at 13 (asserting that "[w]hen applied to the voluntary cessation of government actions, these rules are much less stringent than when applied to private parties") *with Rio Grande*, 601 F.3d at 1116 n.15 (declining to "opine here on what explicit measure—if any—of greater solicitude is due administrative agencies in the application of [mootness]").

### i. Defendants Have not Made Absolutely Clear that the Alleged Violations Will Not Recur.

Defendants' limited commitments to temporarily suspend the leases and to prepare additional NEPA analysis regarding GHG emissions and climate change fail to make "absolutely clear" that all alleged violations will not recur.

The lease suspension is insufficient to moot this case as it is, by BLM's own admission, merely temporary. BLM expressly anticipates that the suspension will be lifted after the completion of new NEPA analysis.[75] Courts have made clear that this type of temporary cessation cannot moot a case.[76] Absent a commitment to cancel the leases and rescind the decision records at issue, BLM fails to make "absolutely clear" that Plaintiffs' alleged violations will not recur.

Defendants claim that once BLM lifts the lease suspension, it will have corrected the "alleged procedural flaws about which [Plaintiffs] now complain[]."[77] This is simply not true. Defendants have not committed to address <u>any</u> of Friends' alleged violations. Likewise, they have committed—at most—to address only <u>one</u> of SUWA's alleged violations. Under such circumstances, it is "absolutely clear" that Plaintiffs' remaining alleged violations <u>will recur</u> rather than the opposite outcome which is required for mootness.

---

[75] Motion at 5; Docket No. 40-3 at 1 ("BLM has concluded that it is necessary to suspend the above-referenced lease until the completion of appropriate environmental analyses under NEPA.").

[76] See, e.g., *City of Los Angeles v. Lyons*, 461 U.S. 95, 101 (1983) ("the case is not moot, since the moratorium, by its terms, is not permanent."); *Mhany Mgmt., Inc. v. County of Nassau*, 819 F.3d 581, 604 (2d Cir. 2016) (finding case not moot where County did not persuade the court that it "permanently" committed to a new course of action); *Carpenter v. Dep't of Transp.*, 13 F.3d 313, 314 n.1 (9th Cir. 1994) (finding case not moot where defendant's programmatic change was only temporary); *Hooker Chem, Co. v. U.S. Envtl. Prot. Agency*, 642 F.2d 48, 52 (3d Cir. 1981) ("[a] controversy still smoulders when the defendant has voluntarily, but not necessarily permanently, ceased to engage in the allegedly wrongful conduct.").

[77] Motion at 12; *see also id.* at 13 ("there can be no reasonable expectation that a future decision from BLM will suffer from the same alleged flaws about which [Plaintiffs'] now complain[].").

The limited commitments made by BLM here distinguish this case from the decisions Defendants rely on such as *Rio Grande* and *SUWA II*—both of which involved situations in which the defendants had committed to take (or had already taken) actions to address <u>all</u> alleged harms (*i.e.*, the defendants had made "absolutely clear" that the alleged violations would not recur).[78] In contrast, the supplemental environmental analysis here will address just one of the seven claims that Plaintiffs collectively pursue.

Finally, the mere possibility of future lease cancellation also fails to make "absolutely clear" that the violations will not recur. Counsel for BLM suggests, without any record evidence, that BLM will consider cancelling the leases based on its supplemental NEPA analysis.[79] However, BLM has not committed to this outcome or even suggested it is likely. This speculative possibility of lease cancellation falls far short of Defendants' heavy burden of making clear that the leases <u>will</u> be cancelled. In fact, available evidence suggests that lease cancellation is unlikely. In *WildEarth Guardians v. Jewell*,[80] the case which prompted Defendants to conduct the corrective NEPA analysis here, the court remanded to BLM to perform an adequate climate change analysis under NEPA of its decision to issue a set of Wyoming oil and gas leases.[81] BLM performed that NEPA analysis in just three weeks and simply reaffirmed its original decision, without cancelling or modifying a single lease.[82]

---

[78] *Rio Grande*, 601 F.3d at 1111-12 (explaining that defendants' actions completely eradicated plaintiffs alleged harms); *SUWA II*, 250 F. Supp. 3d at 1087 (holding that plaintiffs' alleged harms had "evaporated" based on defendants commitment to take actions that resolved all of the harms).

[79] *See* Motion at 5 (citing Exhibit C, which nowhere states that BLM will consider cancelling the leases). *But see* <u>Camp v. Pitts</u>, 411 U.S. 138, 142 (1973) ("the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court.").

[80] 368 F. Supp. 3d. 41.

[81] *See id.* at 85.

[82] *See* BLM, BLM-Wyoming Supplemental Environmental Assessment for the May 2015-August 2016 Sold and Issued Leases, DOI-BLM-WY-0000-2019-0007-EA at 2 (May 2019), https://eplanning.blm.gov/epl-front-office/projects/nepa/121368/172332/209480/20190507.WYWEGvZinke.SupplementalEA_Decision_Record.pdf (attached as Exhibit 1) ("As a result of this supplemental analysis, it is my decision to select the proposed action described in the supplemental EA, which is to affirm BLM' s previous decisions to offer and issue leases for the subject lands.").

15

Therefore, Defendants have failed to carry their burden to make absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.[83]

### ii. Defendants Have Not "Completely and Irrevocably Eradicated" the Effects of Their Violations.

Defendants similarly fail to carry their burden as to the second prong of the voluntary cessation exception, which requires them to prove that interim events have "completely and irrevocably eradicated the effects of the alleged violation."[84] Defendants cannot meet this burden here for two reasons: first, they have not rescinded the underlying NEPA documents and decisions records (including cultural resource reports) and, importantly, continue to rely on those same documents to support future oil and gas leasing decisions; second, the mere existence of the March and December 2018 leases continues to harm Plaintiffs' interests. These harms exist regardless of whether the leases are (or are not) suspended.

First, Defendants continue to rely on its March 2018 Lease Sale EA to justify additional, more recent, oil and gas leasing decisions in this same region of San Juan County, Utah. For example, at its recently completed September 2019 lease sale BLM offered and sold nineteen leases for public lands in southeastern San Juan County, including adjacent to leases offered and sold at the March and December 2018 lease sales.[85] BLM relied upon and incorporated the March 2018 Lease Sale EA and accompanying FONSI-DR to avoid analyzing impacts to certain resources, including those at issue in this litigation. This includes, but is not limited to:

- Lands with wilderness characteristics. BLM did not analyze impacts to the Monument Canyon or Tin Cup Mesa areas—both at issue in this litigation—because "the March 2018 Oil and Gas Lease Sale EA disclosed the possible impairment of [those]

---

[83] *See Cnty. of Los Angeles*, 440 U.S. at 631.
[84] *Id.*
[85] *See generally* BLM, September 2019 Competitive Oil and Gas Lease Sale, Monticello Field Office, DOI-BLM-UT-0000-2019-0003-OTHER NEPA-MtFO-EA (July 2019), https://eplanning.blm.gov/epl-front-office/projects/nepa/121035/20000219/250000268/2019-07-25-Sep19-MtFO-DOI-BLM-UT-0000-2019-0003-EA.pdf (excerpts included in Exhibit 2).

Units."[86] BLM later doubled-down on its reliance on the March 2018 Lease Sale EA, stating: "the analysis of impacts to wilderness characteristics does not need to be started 'from scratch' for every decision."[87]

- <u>Cultural resources</u>. BLM declined to analyze potential impacts to cultural resources because "cultural resource analysis was completed in the March 2018 EA."[88] BLM stated that it had "incorporate[d] the analysis" from the March 2018 Lease Sale EA, claiming that the impacts of the two sales "would be essentially the same."[89]

- <u>Fish and wildlife</u>. BLM declined to analyze potential impacts to fish and wildlife resources because those impacts "were fully analyzed in . . . the March 2018 [Lease Sale] EA."[90] According to BLM, "[a]ctions and impacts are not changed from those disclosed in th[at] NEPA document[]."[91]

BLM similarly relied on the March 2018 Lease Sale EA to support its upcoming December 2019 lease sale, which includes additional leases in this same region of San Juan County.[92] In other words, not only have Defendants refused to rescind their approval of the March 2018 Lease Sale EA and accompanying FONSI-DR but they continue to rely on that same analysis to support additional oil and gas leasing decisions in this same area.

Second, Plaintiffs' declarations establish that the mere existence of the challenged leases—even while suspended—harms their interests.[93] The issuance of a surface occupancy oil and gas lease (such as the leases at issue in this litigation) is the "point of no return" at which

---

[86] *Id.* at 15 (emphasis added). *See also id.*, App. D at 112 ("Potential impacts to [lands with wilderness characteristics] from oil and gas leasing are adequately analyzed and documented in the environmental analysis prepared for the . . . March 2018 [Lease Sale] EA.").
[87] *Id.*, App. H at 124.
[88] *Id.* at 17.
[89] *Id.*, App. H at 140.
[90] *Id.*, App. D at 101.
[91] *Id.*
[92] *See* BLM, December 2019 Competitive Oil and Gas Lease Sale, DOI-BLM-UT-0000-2019-0005-OTHER NEPA-EA at 15 (Aug. 2019) (stating that BLM did not analyze impacts to the Monument Canyon lands with wilderness characteristics unit because "the March 2018 Oil and Gas Lease Sale EA disclosed the possible impairment of the Unit"), https://eplanning.blm.gov/epl-front-office/projects/nepa/123688/20002533/250003004/2019-08-29-Dec19-DOI-BLM-UT-0000-2019-0005_Other-NEPA-EA.pdf (excerpts attached as Exhibit 3).
[93] *See* Declaration of Josh Ewing (attached as Exhibit 4); Declaration of Neal Clark (attached as Exhibit 5); Declaration of Jeremy Lynch (attached as Exhibit 6).

BLM makes "an irrevocable commitment to allow *some*" oil and gas development to occur on a particular lease.[94]

As Plaintiffs' supporting declarations explain, lands encumbered by oil and gas leases—even suspended leases—are therefore less likely to be protected for conservation purposes.[95] Specifically, the mere existence of an oil and gas lease harms plaintiffs and their members by, among other things: (1) making it more difficult to achieve permanent protective designations for the leased acreage, and (2) providing BLM with a rationale not to manage the leased acreage for the protection of resource values, including wilderness characteristics and cultural resources.[96]

For these reasons, Defendants have failed to carry their burden to demonstrate that they have "completely and irrevocably eradicated the effects of" Plaintiffs alleged violations, and thus their narrow commitments have not mooted this case.

## CONCLUSION

For the reasons contained herein, this Court should deny the Defendants' Motion to Dismiss and allow this case to proceed to the merits.

Respectfully submitted this 19th Day of September, 2019.

/s/ Sarah Stellberg (with permission)
Sarah Stellberg
Todd Tucci
Attorneys for Friends of Cedar Mesa

/s/ Landon Newell
Landon Newell
Stephen Bloch
Attorneys for Southern Utah
Wilderness Alliance

---

[94] *WildEarth Guardians*, 368 F. Supp. 3d at 66 (emphasis in original); *see also* 43 C.F.R. § 3101.1-2 (describing oil and gas lease surface use rights).
[95] *See, e.g.*, Decl of Neal Clark ¶¶ 9-14; Decl. of Jeremy Lynch ¶¶ 9-10; Decl. of Josh Ewing ¶¶ 10-11.
[96] *Id.*